UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BILLY DON BATEMAN,

    Plaintiff,

v.

JEREMY DRIGGETT AND CITY OF BURTON,

    Defendants.

                                            /

Case No. 11-13142

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [14]**

    This civil rights action comes before the Court on the Defendants City of Burton's and Burton Police Officer Jeremy Driggett's motion for summary judgment. The action arises out of an incident that occurred on June 29, 2010, when Officer Driggett went to Plaintiff's home in response to a neighbor's complaint about loud fireworks. After he was on Plaintiff's property and had announced his presence, Officer Driggett and a citizen who was accompanying him testified that Plaintiff's 70 to 80 pound pit bull aggressively charged Officer Driggett and chased them as they turned and ran down Plaintiff's driveway. Officer Driggett testified that, when Plaintiff's dog lunged at him, he fired one shot at the dog, severely injuring him. The dog required emergency and additional medical care but did survive.

    Plaintiff filed a complaint against Defendants in state court alleging both federal and state-law claims. After Defendants timely removed the action here, this Court remanded

the state-law claims.  Only Plaintiff's federal civil rights claims, brought pursuant to 42 U.S.C. § 1983, are at issue.  Specifically, Plaintiff alleges that Defendant Officer Driggett violated his Fourth and Fourteenth Amendment rights when he unreasonably seized Plaintiff's constitutionally-protected property – his dog.  Plaintiff also asserts a claim of municipal liability against Defendant City.  For the reasons stated below, Defendants' motion for summary judgment is GRANTED.

**I.    Facts**

On June 29, 2010, at around 10:23 p.m., City of Burton Police Officer Driggett responded to a complaint from one of Plaintiff's neighbors about loud fireworks coming from the direction of Plaintiff's home.  (Defs.' Mot., Ex. A, Police Rpt.)  Officer Driggett went to Plaintiff's home at 1452 Kenneth Street, Burton, Michigan.  He had a citizen, Paul Melrose, riding along with him that night. (Defs.' Mot., Ex. B, Melrose Dep. at 6; Pl.'s Resp., Ex. A, Driggett Dep. at 7-8, 29, 44.)  Mr. Melrose was interested in becoming a law enforcement officer.

Once Officer Driggett and Mr. Melrose arrived at Plaintiff's home, they got out of the police car.  Fireworks were not going off at that time. (Driggett Dep. at 9.)  Officer Driggett was not familiar with the home.  He began walking up the driveway, first through an open chain link fence next to the sidewalk and then through an open wooden gate further up the driveway.  There were several vehicles parked in the driveway.  He approached a side door located on a porch on the west side of the house because that looked like the one most commonly used by residents.  Mr. Melrose stayed further back on the driveway for safety reasons.  (Driggett Dep. at 9-12; Melrose Dep. at 6.)  Officer Driggett did not notice a sign

on the wooden gate that warned of a dog on the premises and was unaware that Plaintiff had a dog. (Driggett Dep. at 11.)

As he went to knock on the door, Officer Driggett could hear music playing loudly and voices coming from the detached garage in the backyard. The side porch is elevated, and he could see people sitting around a table in the garage. Instead of knocking, Officer Driggett verbally announced himself as the police while shining his flashlight at the garage. He asked the occupants to turn the music down, announced himself again, and asked to speak with the homeowner. He was still on the porch when he did this. No one responded. (Driggett Dep. at 10-11, 25, 38.)

Officer Driggett was on the porch less than a minute when he observed Plaintiff's pit bull get up and run out of the garage. Paul Melrose, the citizen accompanying him, was behind him further down the driveway. (Driggett Dep. at 12, 14.)

Officer Driggett testified that, while he was on the porch, Plaintiff's pit bull came directly at him, charging him. He then turned and began running down the driveway towards the street, yelling to Mr. Melrose to run too because there was a dog. The pit bull was growling, not barking, as it chased Officer Driggett. He got to a spot on the driveway between the wooden gates and the chain link fence when he turned and saw the dog was closing in on him. He saw the pit bull lunge at him and try to bite him. That's when Officer Driggett fired one shot and hit the dog. (Driggett Dep. at 14-16, 20, 30.)

Before this incident, Officer Driggett had responded to numerous citizen complaints about aggressive or unrestrained pit bulls. He had also been bitten once by a Rottweiler, despite the owner's assurance that the dog was very friendly, when responding to a

neighbor's complaint that the dog was being aggressive to children. (Driggett Dep. at 30-32.)

Testimony from the ride-along citizen, Paul Melrose, corroborates that of Officer Driggett. Mr. Melrose testified that, when Officer Driggett went up Plaintiff's driveway to the elevated porch, he could hear people in the garage laughing and talking and could hear music playing. He saw Officer Driggett go up on the porch, take out his duty light and shine it a few times in the direction of the garage. He heard Officer Driggett identify himself as a Burton police officer and heard him ask the people in the garage to come talk to him. None one responded, but the talking and laughing stopped. Mr. Melrose heard Officer Driggett once again identify himself as a police officer, heard him ask the people in the garage to please turn the music down, and come talk to him. It was then that Mr. Melrose heard a distinctive growl from what sounded like a dog. He saw a flash of movement, and then saw Officer Driggett turn and run and heard him yell to him "oh, shit, dog, run." (Melrose Dep. at 6-7.)

Mr. Melrose turned around and ran as fast as he could toward the road. The whole time he could hear the 70 to 80 pound pit bull barking, growling, being aggressive, and running fast after Officer Driggett and him. He was almost to the road when he heard a large pop and a yelp. He turned around and saw the dog running away. He asked Officer Driggett "what was that?" Officer Driggett replied, "I shot the dog, it almost bite [sic] me." He was about five or six feet away from Officer Driggett when he heard the shot. He testified that he had no doubt that if Officer Driggett had not shot the dog, one of them would have been injured by it. (Melrose Dep. at 7-9.)

Officer Driggett did not see Plaintiff or anyone else come out of the garage until after the pit bull was shot and had run away. (Driggett Dep. at 17, 40.) Immediately after that,

4

Plaintiff approached Officer Driggett. (Melrose Dep. at 7.) Officer Driggett testified that Plaintiff was very upset, swore at him, and asked him if he shot his dog. Before Officer Driggett could answer, Lorraine Barber, who had been in the garage, told Plaintiff that it was just fireworks. Officer Driggett then corrected her and told Plaintiff that he had shot his dog. He gave Plaintiff his flashlight to search for the dog, who had run off back up towards the back yard. Officer Driggett stayed out by the road as Plaintiff searched for the dog. He felt threatened by Plaintiff, who was very upset, and called for backup. (Driggett Dep. at 17, 40-41.)

After Plaintiff and Ms. Barber located the dog, Officer Driggett directed them to a local 24-hour animal clinic. Plaintiff and Ms. Barber then jumped into a car, and sped off. (Driggett Dep. at 18, 41.) Once Plaintiff left, Officer Driggett cancelled the call for backup but told Officer Mahon, his senior officer, to still respond. (Driggett Dep. at 41-42.) Officer Driggett had already called his senior officer to come to the scene because it was standard procedure to do so when an officer discharges his weapon. (Driggett Dep. at 18-19.) Once Officer Mahon arrived, Officer Driggett explained what happened, showed him where he shot the dog, they located the shell casing, and collected it for evidence. The shell casing was located right next to a truck parked between the chain link fence and wooden gates, near some landscape rocks. (Driggett Dep. at 19.)

While still at Plaintiff's home, Officer Driggett spoke with Randy Perry, one of the individuals present that evening. At first Mr. Perry told Officer Driggett that the dog appeared to be aggressively attacking him. But then, Mr. Perry appeared to get mad and asked Officer Driggett why he would shoot the dog for no reason. Officer Driggett thought he smelled alcohol on Mr. Perry's breath, believed he had been drinking, but put his

5

conflicting statements in his police report nonetheless. (Driggett Dep. at 23; Pl.'s Resp., Ex. F, Police Rpt.) Mr. Perry's deposition has not been provided. (Pl.'s Dep. at 58.)

Officer Driggett was at Plaintiff's home from 10:25 p.m. until 10:42 p.m., seventeen minutes. (Driggett Dep. at 23; Pl.'s Resp., Ex. F., Police Rpt.) After this incident, Officer Driggett's supervisor conducted an investigation, and he was cleared of any wrongdoing. (Driggett Dep. at 27-28.)

Plaintiff testified as follows about the events that occurred on June 29, 2010. He, Lorraine Barber, Randy Perry, and two other men, Don Chittick and John Neil, were sitting around a table in his garage that evening. (Pl.'s Dep. at 16-19.) The wooden gates and gate to his chain link fence were both open. Two vehicles were parked between the chain link and wooden fences. (Pl.'s Dep. at 28.) Although he heard fireworks going off that night, he denies that he or his guest were shooting them off. (Pl.'s Dep. at 32-33.) All of a sudden, his dog got up and walked out of the garage into the driveway. Plaintiff stood up because he wanted to close the gates so his dog could not wander away. Mr. Perry, who also went into the yard, then said something to him. Plaintiff did not hear it, but Mr. Perry told him later that he said, "The police are here." Ms. Barber was over by the radio, turning it down. (Pl.'s Dep. at 36-40, 42-43, 57-58.)

Plaintiff did not know the police were on his property until after he heard what he thought was two gunshots. He did not hear Officer Driggett announce his presence. After he heard shots, Plaintiff looked over a van parked in his driveway and saw a police officer inside the wooden gates standing near the driver's side of a truck parked in his driveway and next to his back porch, and Plaintiff thought he looked like he was getting ready to take aim again at his dog. (Pl.'s Dep. at 43-44, 48-49, 52, 54, 59, 67.) Plaintiff went up to

6

Officer Driggett and asked him loudly if he shot his f...ing dog. (Pl.'s Dep. at 54.) Plaintiff then went looking for his wounded dog, came back and asked Officer Driggett for his flashlight, got the dog, carried the dog to a vehicle, and rushed to a nearby animal clinic. Plaintiff's dog ultimately had to have surgery on his jaw at the Michigan State University veterinary clinic. (Pl.'s Dep. at 54-57, 60.)

Plaintiff concedes that he did not see his dog approach Officer Driggett. (Pl.'s Dep. at 59.)

Ms. Barber also testified about the events that occurred on June 29, 2010. She was sitting in Plaintiff's garage around a table along with the others. The radio was on. They had just finished hooking up speakers and wanted to see how loud it would go. She got up to turn the radio down or off when Plaintiff's dog passed by her, then Plaintiff walked out of the garage, and he was followed by Mr. Perry. Ms. Barber went back in the garage and heard what she thought was a firework. Next, she heard screaming, "Did you shoot my dog." (L. Barber Dep. at 12-13, 15.)

Ms. Barber did not see Officer Driggett until after she heard what she thought was a firework. (L. Barber Dep. at 13, 48.) She never heard him announce his presence. (L. Barber Dep. at 18-19.) She admitted, however, that the officer could have said something that she did not hear because she was right in front of the radio speakers. (*Id.* at 19.) Specifically, she testified that:

A: . . . And I never did see a police officer 'til he was on the porch by the house.

Q: After the shot had already happened?

A: Yeah. It was too loud for me. I actually thought it was a firework. I didn't realize it was a shot. I actually had turned down the radio and headed back into the garage to sit – and I was the only one sitting down. . . .

> Q: You didn't even realize what had occurred?
>
> A: No, I didn't. 'Cause somebody says, "Oh, it sounds like a gunshot." I said, "Oh, no. It's just a loud firecracker like an M-80 or something," 'cause the neighbors had been setting off fireworks.

(L. Barber Dep. at 13-14, 21, 49-50.)

Ms. Barber also conceded that when she turned the radio down or off, her back was turned, and she could not see where the dog was headed after he left the garage. She admitted that she could not dispute Officer Driggett's testimony that the dog ran at him. (L. Barber Dep. 15-17.) She also testified that both Don Chittick and John Neil could not have seen anything before the gunshot because they were in the garage; that no one saw anything until after Plaintiff's dog was shot. (L. Barber Dep. at 17-18.)

> Q: And based upon your being there and what you saw and heard, would you agree that the only person that probably saw what was going on at the time of the shot was the officer?
>
> A: Pretty much. . . .

(L. Barber Dep. at 18.)

Although Ms. Barber insisted that Plaintiff's dog was friendly to everyone and would not charge aggressively, she admitted that it would be reasonable for Officer Driggett to be intimidated by Plaintiff's dog if it ran at him. Indeed, she said, "I'd be intimidated." (L. Barber Dep. at 22, 34.)

John Neil and Don Chittick were also deposed. Their testimony corroborates that of Plaintiff and Ms. Barber -- no one saw Officer Driggett until after he shot Plaintiff's dog. Don Chittick testified that he was not aware that anything had happened until he heard Plaintiff say "Did you shoot my dog?"

> Q: Did Randy Perry say anything before Billy said, "Did you shoot my dog?"

8

> A: I think Randy had yelled for Billy, and that's when Billy got up. And like I said, they went outside the garage there, and they said something to each other, you know. I was still in the garage with the radio going. I didn't really hear. Alls I could hear Billy scream, "Did you shoot my dog?" And you know, I was -- that's when I seen him chasing after the dog.

(Defs.' Reply, Ex. B, Chittick Dep. at 14.) Mr. Chittick did not see Officer Driggett until after Plaintiff's dog was shot. He did not see the dog get shot. (Chittick Dep. at 15.) Like Ms. Barber, although Mr. Chittick insisted that Plaintiff's dog was not aggressive, he conceded that he could not dispute Officer Driggett's testimony that the 70 to 80 pound pit bull came running down the driveway at him. (*Id.* at 15-17.) The police asked Randy Perry some questions but did not interview Mr. Chittick because he told them, "I was in the garage and never seen nothing." (*Id.* at 17.)

Mr. Neil similarly testified that he was in the garage with Ms. Barber and Mr. Chittick when he saw a flash of light and heard a big bang. After that, Plaintiff's dog ran into the garage and was bleeding. Mr. Neil heard Plaintiff ask Officer Driggett, "Did you shoot my dog?" He also heard Officer Driggett respond, "Yeah" and "I'm a Burton cop." (Pl.'s Resp., Ex. E, Neil Dep. at 12-13, 17.) Mr. Neil did not hear or see Officer Driggett until after he heard the big bang and exited the garage. When Mr. Neil first saw him, Officer Driggett was on the steps leading up to the porch/deck area of Plaintiff's home, and Mr Neil said he had a gun in his hand. (Neil Dep. at 13, 17, 26.)

> Q: And you never saw any police officer before the flash and the bang?
>
> A: Yeah, I didn't -- no, I didn't see nothing there; just after -- like I say, after the gun went off and stuff and I got up and started walking out, and then I seen him. He was stepping up on the steps.

(*Id.* at 16.) Mr. Neil admitted he could not see where Mr. Perry, Plaintiff, or Plaintiff's dog were before he head the bang. (*Id.* at 15, 17.) Similar to the others, Mr. Neil described

9

Plaintiff's dog as being playful and friendly, but admitted that he had no information to dispute Officer Driggett's testimony that the pit bull ran at him. (Neil Dep. at 17-18.) He concedes that he did not hear the dog before he was shot. (*Id.* at 18.)

In May 2011, Plaintiff filed suit against Defendant City and Defendant Officer Driggett asserting a civil rights claim, brought under 42 U.S.C. § 1983, alleging that Defendants violated his Fourth and Fourteenth Amendment rights when they shot his dog, and state-law claims for intentional infliction of emotional distress and gross negligence. Defendants timely removed the action here, and this Court remanded Plaintiff's state-law claims. This matter is now before the Court on Defendants' motion for summary judgment.

## II.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

### III. Analysis

Defendants' motion for summary judgment argues that (1) because Officer Driggett's shooting of Plaintiff's dog was objectively reasonable under the circumstances, Plaintiff cannot establish a Fourth or Fourteenth Amendment claim; (2) even if Plaintiff could establish a constitutional violation, Defendant Officer Driggett is entitled to qualified

immunity; and (3) Plaintiff cannot establish a claim of municipal liability against Defendant City because there is no evidence that it had a policy or practice that was the moving force behind a violation of his constitutional rights. Plaintiff argues the opposite. This Court agrees with Defendants. Considering the facts in the light most favorable to Plaintiff, this Court concludes that no rational jury could find that Defendant Officer Driggett violated Plaintiff's Fourth or Fourteenth Amendment rights. Moreover, absent a constitutional violation, there can be no municipal liability against Defendant City.

### A. Alleged Fourth and Fourteenth Amendment Violation

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. Plaintiff is correct that the federal courts "have consistently recognized that a law enforcement officer's killing of a pet dog constitutes a destruction of property and therefore a seizure under the Fourth Amendment." *Dziekan v. Gaynor*, 376 F. Supp. 2d 267, 270 (D. Conn. 2005) (citing cases). *See also Viilo v. City of Milwaukee*, 552 F. Supp. 2d 826, 837 (E.D. Wisc. 2008) (same, citing additional cases). That Plaintiff's pit bull was not killed does not mean that it was not seized. "A 'seizure' of personal property occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Id.* (quoting *Soldal v. Cook County, Ill.*, 506 U.S. 56, 61 (1992)). When Plaintiff's pit bull was shot and severely injured, there was meaningful interference with his possessory interests in his pet dog. Defendants do not

dispute any of this. Rather, the parties' dispute hinges on the reasonableness of that seizure, the touchstone of a Fourth Amendment violation.[1]

Defendants argue that the warrantless seizure of Plaintiff's dog was reasonable under the circumstances. Courts addressing the seizure of a plaintiff's pet dog have discussed the appropriate Fourth Amendment analysis. "[A] warrantless seizure may be reasonable if the governmental interest justifying the seizure is sufficiently compelling and the nature and extent of the intrusion is not disproportionate to that interest." *Viilo*, 552 F. Supp. 2d at 839. So, application of the reasonableness test requires the Court to balance "the nature and quality of the intrusion on the plaintiff's Fourth Amendment rights against the countervailing government interest at stake." *Dziekan*, 376 F. Supp. 2d at 270-71.

Additional general principles guide the Court's analysis. First, the reasonableness test is objective; "it does not turn on the subjective intent of the officer." *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003). Second, as observed by the Supreme Court, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). This Court's task therefore "is to put itself into the shoes of the officer[ ] at the time the actions took place and to ask

---

[1] To the extent Plaintiff's complaint asserts a Fourteenth Amendment substantive due process claim based on Officer Driggett's shooting of his dog, that claim is dismissed because the Fourth Amendment provides an explicit source of protection against the alleged civil rights violation. *See Dziekan*, 376 F. Supp. 2d at 270 (observing, under similar circumstances, that "[w]here a constitutional amendment provides an explicit textual source of protection against certain governmental misconduct, that amendment is the guide for analysis of the claim rather than the generalized notion of substantive due process.").

13

whether the actions taken by the officer[ ] [were] objectively reasonable." *Altman*, 330 F.3d at 205.

The federal courts considering this issue have acknowledged that there is a strong governmental interest "in allowing law enforcement officers to protect themselves and the citizenry from animal attacks" and "have generally held that no unreasonable seizure may be found where an officer has killed a dog that posed an imminent threat." *Dziekan*, 376 F. Supp. 2d at 271 (citing cases). The courts have also acknowledged that "the private Fourth Amendment interests involved are appreciable," that "the bond between a dog owner and his pet can be strong and enduring," and some "think of dogs solely in terms of an emotional relationship, rather than a property relationship." *Altman*, 330 F.3d at 205. So, in circumstances where the dog does not pose an imminent threat, or the officer is not surprised by the dog and has had time to make alternate plans to control the dog, other than shooting, the shooting of the dog has been found to be an unreasonable seizure. *See Dziekan*, 376 F. Supp. 2d at 271 (citing cases and discussing of *San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 975 (9th Cir. 2005)).

Construing the evidence in the light most favorable to Plaintiff, Defendant Officer Driggett's seizure of Plaintiff's dog by shooting him was objectively reasonable under the circumstances. It is undisputed that the events that occurred on June 29, 2010 occurred in rapid succession. Officer Driggett was on the scene only 17 minutes from arrival to departure. It was 10:23 in the evening and dark. Officer Driggett was not familiar with Plaintiff's home. As he walked up through two sets of open gates on Plaintiff's crowded driveway, he did not see the sign posted on the wooden gate warning that a dog was

14

present. He was not aware that Plaintiff's 70 to 80 pound pit bull was unrestrained in Plaintiff's detached garage.

Officer Driggett testified that after he was on Plaintiff's elevated side porch, he could hear loud music and voices coming from the detached garage in the backyard. He shined his flashlight at the garage and announced that he was a police officer. He asked the occupants of the garage to turn the music down, announced himself again as a police officer, and asked to speak with the homeowner. The citizen accompanying him that night heard him announce his presence. No one responded. (Driggett Dep. at 10-11, 25, 38; Melrose Dep. at 6-7.) Testimony that Plaintiff, Ms. Barber, and the others in the garage did not hear Officer Driggett announce his presence does not give rise to a reasonable inference, as opposed to mere speculation, that he did not do so.

Officer Driggett was on the elevated porch less than a minute when he saw Plaintiff's large pit bull run out of the garage directly at him, charging him. He had had prior experience with aggressive dogs and reacted quickly. He turned and began running down Plaintiff's driveway towards the street, yelling to Mr. Melrose to run too. Officer Driggett testified that the pit bull was growling. Mr. Melrose also heard a distinctive dog growl right before Officer Driggett started running and told him to run. The whole time Mr. Melrose was running, he could hear the 70 to 80 pound pit bull barking, growling, being aggressive, and running fast after Officer Driggett and him. (Driggett Dep. at 12, 14-16, 20, 30-32; Melrose Dep. at 6-9.) Officer Driggett got to a spot on the driveway between the wooden gates and the chain link fence when he turned and saw the dog was closing in on him. The pit bull lunged and tried to bite him, and he fired one shot and hit the dog. (Driggett Dep.

15

at 14-16, 20, 30.) Mr. Melrose was about five or six feet further down the driveway, almost to the road, when he heard a large pop and a yelp. He turned around and saw the dog running away, and Officer Driggett told him that he shot the dog when it almost bit him. Mr. Melrose testified that he had no doubt that if Officer Driggett had not shot the dog, one of them would have been injured by the dog. (Melrose Dep. at 7-9.)

It is undisputed that neither Plaintiff nor any of the others present saw Officer Driggett until after the dog was shot. They conceded that, although they believed it was not in the dog's nature to be aggressive, they did not see and thus could not dispute Officer Driggett's testimony that the dog charged and chased him in an aggressive manner before he shot the dog. Plaintiff conceded that he did not see his dog approach Officer Driggett. (Pl.'s Dep. at 59.) Ms. Barber testified that she did not see Officer Driggett until after she heard what she thought was a firework. (L. Barber Dep. at 13, 48.) She insisted that Plaintiff's dog was friendly, but admitted that she'd be intimidated if it ran after her. (L. Barber Dep. at 22, 34.) John Neil and Don Chittick both testified that they did not see the dog get shot and did not see Officer Driggett until after the dog was shot. (Chittick Dep. at 14-17; Neil Dep. at 12-13, 15-18.)

The undisputed facts presented here are distinguishable from those present in the Ninth Circuit decision Plaintiff relies upon. In *The San Jose Charter of Hell's Angels Motorcycle Club* case, the court emphasized that the San Jose police officers were aware that dogs were present on the property before they executed a search warrant and thus had time to make a plan to subdue them rather than just killing them. 402 F.3d at 977-78. The Ninth Circuit determined that, unlike other cases "where the officer was reacting to a

sudden unexpected situation," the San Jose police officers "were given a week to plan the entry." *Id.* at 978. Because the police failed "to develop any realistic non-lethal plan for dealing with the dogs," the Ninth Circuit affirmed the district court's denial of the police officer's motion for qualified immunity. *Id.*

For these reasons, Plaintiff's § 1983 claim alleging violations of his Fourth and Fourteenth Amendment rights are dismissed. In light of this ruling, the Court need not consider Defendants' additional argument that Defendant Officer Driggett is entitled to qualified immunity.

### B. Plaintiff's Municipal Liability Claim Against Defendant City

Plaintiff argues that Defendant City is liable under 42 U.S.C. § 1983 for failing to adequately train its police officers. In light of this Court's decision that Defendant Officer Driggett did not violate Plaintiff's constitutional rights, Plaintiff cannot maintain his claim of municipal liability. "To succeed on a municipal liability claim, a plaintiff must establish that his or her constitutional rights were violated. . . ." *Miller v. Sanilac County*, 606 F.3d 240, 254-55 (6th Cir. 2010). Plaintiff's municipal liability claim against Defendant City is also dismissed.

### IV. Conclusion

For the above-stated reasons, Defendants' motion for summary judgment is GRANTED.

      s/Nancy G. Edmunds
      Nancy G. Edmunds
      United States District Judge

Dated: July 2, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 2, 2012, by electronic and/or ordinary mail.

      s/Carol A. Hemeyer
      Case Manager